# EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF MISSOURI
 2
      DARYL WHITE, JR., individually  )
 3    and on behalf of all others     )
      similarly situated in Missouri, )
 4                                     )
                   Plaintiffs,         ) Civil Action No.
 5                                     ) 2:17-CV-C-04025-NKL
             -vs-                      )
 6                                     )
      JUST BORN, INC.,                 )
 7                                     )
                   Defendant.          )
 8

 9         Deposition of MICHAEL DAVID PAKTER, taken

10    before DONNA L. POLICICCHIO, C.S.R., and Notary

11    Public, pursuant to the Federal Rules of Civil

12    Procedure for the United States District Courts

13    pertaining to the taking of depositions, at 550 West

14    Adams Street, Fourth Floor, Chicago, Illinois,

15    commencing at 9:22 a.m., on the 8th day of May, 2018.

16

17

18

19

20

21

22

23

24

25
```

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 2 of 72

```
1    BY MR. KIZIRIAN:
2        Q    No.  Sir, my question is actually more
3    general.  In coming up with -- when you prepare
4    damages models for cases like this one, do you look
5    to see if the type of recovery that you would be
6    giving under your damage model is something that is
7    actually available under the cause of action the
8    damage model is intended to address?
9        MR. MOON:  Objection.  Vague.
10       A    I apply my knowledge, training, education,
11   and experience in economic damages to the facts and
12   circumstances of the case, but I don't testify that
13   that is under law the legal remedy for the claims in
14   that case or the only legal remedy in that case or
15   the best legal remedy in that case.
16   BY MR. KIZIRIAN:
17       Q    In preparing a damages model, do you look to
18   see whether the type of remedy that your damage model
19   will provide is available under the law that you are
20   trying to address?
21       MR. MOON:  Objection.  Vague.
22       A    I don't understand that question.
23   BY MR. KIZIRIAN:
24       Q    Did you review the requirements for an unjust
25   enrichment claim in preparing your damage model?
```

```
1        MR. MOON: Objection. Vague.
2        A    What requirements are you talking about?
3   BY MR. KIZIRIAN:
4        Q    The legal requirements for an unjust
5   enrichment claim, did you review it prior to
6   preparing your damages model?
7        MR. MOON: Same objection.
8        A    I don't understand your question.
9   BY MR. KIZIRIAN:
10       Q    Did you review what type of damages are
11  available under an unjust enrichment claim under the
12  law in preparing your damages model?
13       MR. MOON: Objection. Vague.
14       A    Are you saying did I perform the legal
15  research?
16  BY MR. KIZIRIAN:
17       Q    Yes.  Do you have any understanding of what
18  type of damage can be recovered under an unjust
19  enrichment claim?
20       MR. MOON: Same objection.
21       A    I have an understanding from an accounting,
22  business economics, and economic damages point of
23  view based on what my understanding is of generally
24  accepted peer-reviewed economic damages methodologies
25  are.  I'm not opining that those are the legal
```

1   remedies relating to any particular claim or
2   assertion.
3   BY MR. KIZIRIAN:
4       Q   Okay.  Using your manufacturing cost savings
5   model, okay, as the basis for this question, have you
6   checked to see whether that form of damage is
7   something that you can get under the law for an
8   unjust enrichment claim?
9       MR. MOON:  Objection.  Vague, calls for a legal
10  conclusion.
11      A   I don't have a legal opinion in that regard.
12  BY MR. KIZIRIAN:
13      Q   I'm not asking if you have a legal opinion.
14  I'm just saying you've come up with a damages model
15  that provides a remedy on the basis of manufacturing
16  cost savings for an unjust enrichment claim.
17          Have you looked to see whether that remedy
18  is available for that claim under the law?
19      MR. MOON:  Same objection.
20      A   Do you mean I looked as in conducted legal
21  research?
22  BY MR. KIZIRIAN:
23      Q   Do you have any information as to what type
24  of remedies are available under a particular cause of
25  action that plaintiff is asserting?

1    MR. MOON: Objection. Vague, calls for a legal
2  conclusion.
3    A    I have not studied all the legal remedies
4  available to plaintiff.
5  BY MR. KIZIRIAN:
6    Q    Have you studied any of the legal remedies
7  available to plaintiff under an unjust enrichment
8  claim?
9    MR. MOON: Same objections.
10    A    I have not engaged in a legal analysis or
11  legal study of remedies.
12  BY MR. KIZIRIAN:
13    Q    You don't know as you sit here today what
14  form of remedies are available for an unjust
15  enrichment claim as a matter of law, do you?
16    MR. MOON: Objection. Vague, calls for a legal
17  conclusion.
18    A    I'm not opining on legal remedy.
19  BY MR. KIZIRIAN:
20    Q    I understand that. Do you know what remedies
21  are available to a plaintiff asserting an unjust
22  enrichment claim?
23    MR. MOON: Objection.
24    A    Legal remedies?
25

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 6 of 72

1     BY MR. KIZIRIAN:

2          Q    Legal remedies.

3          A    I have not done a study or analysis of legal

4     remedies.

5          Q    Okay.  Have you done any study or analysis as

6     to what type of remedies are available to a plaintiff

7     asserting a Missouri consumer protection claim?

8          MR. MOON:  Same objection.

9          A    I submit that is outside the scope of my work

10    and calls for a legal conclusion.

11    BY MR. KIZIRIAN:

12         Q    Have you looked to see what type of remedies

13    are available to a plaintiff asserting a Missouri

14    consumer protection claim?

15         MR. MOON:  Same objection.

16         A    I don't understand your question.

17    BY MR. KIZIRIAN:

18         Q    Have you looked to see what form of remedies

19    are available to a consumer asserting a Missouri

20    consumer protection claim?

21         MR. MOON:  Objection.  Vague, calls for a legal

22    conclusion.

23         A    I think you just asked the same question.

24    BY MR. KIZIRIAN:

25         Q    I did because it's not vague, but I can ask

1   it a different way.

2       A   If I say it's vague, it doesn't help to ask

3   the same question the same way.

4       Q   Okay.  Have you looked to see what type of

5   damages can be recovered under a Missouri consumer

6   protection claim?

7       MR. MOON:  Objection.  Vague, calls for a legal

8   conclusion, asked and answered.

9       A   I don't understand your question.

10  BY MR. KIZIRIAN:

11      Q   All right.  Do you know if the Missouri

12  protection -- consumer protection claim allows for

13  restitution?

14      A   As a legal remedy?

15      Q   Yes.

16      A   I don't know what the statute provides or

17  does not provide as a legal remedy.

18      Q   You don't know any of the legal remedies that

19  are available under the Missouri consumer protection

20  claim, correct?

21      MR. MOON:  Objection.  Vague, calls for a legal

22  conclusion, asked and answered.

23      A   I have not studied the legal remedies.

24  BY MR. KIZIRIAN:

25      Q   So you don't know?

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 8 of 72

```
 1        MR. MOON: Same objections.
 2        A    I do not know the nature of legal remedies
 3    flowing from that statute.
 4    BY MR. KIZIRIAN:
 5        Q    And you don't know the nature of legal
 6    remedies flowing from an unjust enrichment statute,
 7    correct?
 8        MR. MOON: Same objections.
 9        A    I have not studied that to obtain
10    professional knowledge within my expertise.
11    BY MR. KIZIRIAN:
12        Q    Have you studied that to obtain any knowledge
13    as to the type of legal remedies available under an
14    unjust enrichment claim?
15        MR. MOON: Same objections.
16        A    I have not studied legal remedies under
17    unjust enrichment claims.
18    BY MR. KIZIRIAN:
19        Q    So in developing your damages models for this
20    case you did not develop them on the basis of what
21    legal remedies are available under the unjust
22    enrichment claim, correct?
23        MR. MOON: Same objections.
24        A    I don't understand.
25
```

1    BY MR. KIZIRIAN:

2        Q   You just told me that you did not study the

3    legal remedies that are available under an unjust

4    enrichment claim, correct?

5        A   I did not study it.

6        Q   And you also did not study the legal remedies

7    that are available for a claim under a Missouri

8    consumer protection claim, correct?

9        A   I did not --

10       MR. MOON:  Same objections.

11       THE WITNESS:  I did not study the range of legal

12   remedies.

13   BY MR. KIZIRIAN:

14       Q   So in developing your damages models as

15   articulated in Exhibit 2, those were not based on

16   information you had regarding the range of legal

17   remedies available under those two claims, correct?

18       MR. MOON:  Objection.  Vague, calls for a legal

19   conclusion.

20       A   I don't understand that question.

21   BY MR. KIZIRIAN:

22       Q   When you came up with your damages model,

23   that was not something -- you did not have

24   information on the basis of what legal remedies are

25   available for either an unjust enrichment claim or a

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 10 of 72

1  consumer protection claim under Missouri law,

2  correct?

3      MR. MOON:  Same objections.

4      A    I think you're misunderstanding my opinion of

5  the work that I did, which is not currently to

6  present damages models.  You keep on talking about

7  damages models.

8  BY MR. KIZIRIAN:

9      Q    Okay.

10     A    And I keep on talking about an opinion that

11 damages could be determinable on a class-wide basis

12 using common evidence.

13     Q    Okay.  In coming up with the conclusion that

14 damages could be determined on a class-wide basis on

15 the basis of common evidence, you did not know what

16 remedies or damages are available under an unjust

17 enrichment claim, correct?

18     MR. MOON:  Same objections.

19     A    I did not study all of the legal remedies

20 available under such a claim.

21 BY MR. KIZIRIAN:

22     Q    Did you study any of the remedies available

23 under such a claim?

24     A    I have not undertaken a legal study of

25 remedies.

```
1        Q    And what do you mean by legal study?

2        A    Because you're asking me about legal

3   conclusions and legal opinions.  To me that seems

4   those have to be based on a legal study and a legal

5   analysis study of law and case precedent, et cetera.

6        Q    Okay.  Do you have any understanding of what

7   damages are recoverable under the unjust enrichment

8   claim?

9        MR. MOON:  Objection.  Vague.

10       A    I do not understand that question.

11  BY MR. KIZIRIAN:

12       Q    You did not study what damages are available

13  under an unjust enrichment claim, correct?

14       A    I don't understand that question.

15       Q    What is so hard to understand about it?  Did

16  you or did you not study what claims are available

17  under an unjust enrichment claim?

18       MR. MOON:  Objection.  Vague, asked and answered,

19  argumentative.

20       A    Your repeating the same question at an

21  increased volume does not improve my understanding of

22  the question.

23  BY MR. KIZIRIAN:

24       Q    Okay.  You did not undertake any study as to

25  what type of damages are available under an unjust
```

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 12 of 72

```
1    enrichment claim, correct?

2        MR. MOON:  Same objections.

3        A    I did not perform a legal study of legal

4    remedies available to plaintiffs in this case.

5    BY MR. KIZIRIAN:

6        Q    So you don't know what legal remedies are

7    available to plaintiff under an unjust enrichment

8    claim, right?

9        MR. MOON:  Same objection.  Misstates the

10   testimony.

11       A    I don't have knowledge of all legal remedies

12   available to plaintiffs in this case.

13   BY MR. KIZIRIAN:

14       Q    Okay.  So you keep qualifying it and I need

15   to ask, then if you don't have all, do you have a

16   knowledge of some remedies that are available --

17   legal remedies that are available under an unjust

18   enrichment claim?

19       MR. MOON:  Objection.  Vague.

20       A    I don't understand that question.

21   BY MR. KIZIRIAN:

22       Q    You said you don't have an understanding of

23   all legal remedies that are available under an unjust

24   enrichment claim, correct?

25       A    Correct.
```

1    Q    Do you have an understanding of any legal
2    remedies that are available under an unjust
3    enrichment claim?
4        MR. MOON:  Same objections.
5        A    I have a general understanding that damages
6    may be a remedy in certain circumstances.
7    BY MR. KIZIRIAN:
8        Q    You have an understanding that you can get
9    some type of damage under an unjust enrichment claim,
10   is that fair?
11       A    It's my understanding it is possible that
12   damages are a remedy.
13       Q    But you don't have an understanding as to
14   what type of damage you can get, what specific type
15   of damage you can get under an unjust enrichment
16   claim?
17       MR. MOON:  Objection.  Vague, calls for a legal
18   conclusion.
19       A    I don't understand the question.
20   BY MR. KIZIRIAN:
21       Q    You have an understanding that you can get a
22   remedy, some type of remedy if you prove an unjust
23   enrichment claim, correct?
24       A    It's my understanding that if you prove a
25   claim under the law there may be a remedy under the

1    law.

2    BY MR. KIZIRIAN:

3        Q    But if I ask you what specific remedy is

4    available under that law, that's not something you've

5    studied?

6        A    It appears to me to require a legal opinion.

7        Q    I'm not asking for an opinion. I'm asking if

8    you've studied that or not. Yes or no.

9        A    I have not studied the law and the legal

10    issues relating to such a claim.

11        Q    Not the legal issues. What specific remedies

12    are available under that claim?

13        MR. MOON: Objection. Vague, asked and answered,

14        A    It seems to me that when you talk about a

15    remedy you're talking about something under the law.

16    It seems to me you're calling for a legal conclusion.

17    BY MR. KIZIRIAN:

18        Q    Sir, did you look up what remedies are

19    available under the law for a particular claim? If

20    you didn't look it up, just say so and we'll move on.

21    If you did, tell me what you looked up and what you

22    found. It's fairly simple.

23        MR. MOON: Objection. Vague, misstates his

24    testimony, asked and answered.

25        A    Now you're asking me if I performed research.

1     BY MR. KIZIRIAN:

2          Q    Do you have any understanding what legal

3     remedies, specific legal remedies are available under

4     the law for an unjust enrichment claim?  Yes or no.

5          MR. MOON:  Same objections.

6          A    One more time, please.

7          MR. KIZIRIAN:  Can you repeat the question,

8     please?  I'm sorry.  Can you read the question?

9               (From the record above, the reporter read

10               the following:

11                    "Q    Do you have any understanding

12               what legal remedies, specific legal

13               remedies are available under the law for

14               an unjust enrichment claim?  Yes or no.")

15         MR. MOON:  Same objections.

16         THE WITNESS:  I don't have an understanding of

17    the range of legal remedies that follow from a claim

18    under the law.

19    BY MR. KIZIRIAN:

20         Q    For either unjust enrichment or a Missouri

21    consumer protection claim, correct?

22         MR. MOON:  Same objections.

23         A    I do not have an understanding of all the

24    legal remedies that may be available in such

25    circumstances.

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 16 of 72

1    BY MR. KIZIRIAN:

2        Q    In fact, you don't have an understanding of

3    any of the legal remedies that would flow under such

4    circumstances, correct?

5        MR. MOON:  Same objections.

6        A    I have not studied the range -- one or more

7    or many legal remedies that may or may not exist

8    under the law.

9    BY MR. KIZIRIAN:

10       Q    For an unjust enrichment claim or a consumer

11   protection claim under Missouri law, correct?

12       MR. MOON:  Same objections.

13       A    For those claims.

14   BY MR. KIZIRIAN:

15       Q    Okay.  Thank you.

16            Do you have an understanding what the class

17   period is in this case?

18       A    I do.

19       Q    And what's your understanding?

20       A    My understanding is that the class period as

21   presented in the complaint was five years, though my

22   answer is not intended to change any of plaintiff's

23   claims or rights under the complaint or any

24   subsequent motion.

25       Q    Did you analyze what the criteria for

1   analysis commensurate with my understanding of what
2   manufacturers and distributors of products
3   maintained.
4       Q   Did you review any information on how Just
5   Born sets wholesale prices for its products?
6       A   I don't believe there was information that
7   I've seen on the price-setting processes.
8       Q   Did you review any records that show how
9   retailers price the Mike and Ike and Hot Tamale
10  products?
11      A   I don't believe so as I sit here today.
12      Q   If you look at Exhibit 2, paragraph 16.  You
13  say, Based on my review of the complaint and/or
14  representations from counsel, it is my understanding
15  and I have assumed that plaintiff alleges that -- and
16  then you list a series of facts.
17          Do you see that?
18      A   I do.
19      Q   So this list -- am I correct in stating that
20  the list that follows are assumptions you made in
21  preparing your report?
22      A   I made the assumption that plaintiff alleges
23  those items.
24      Q   Plaintiff does allege these, and for purpose
25  of your report, did you assume them to be true?

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 18 of 72

1  would have to revisit to see if the opinions still

2  stand in light of the factual changes that you

3  assumed?

4      MR. MOON:  Objection.  Vague, calls for

5  speculation.

6      A    If there are any changes at all, I would

7  consider their impact on my conclusions.

8  BY MR. KIZIRIAN:

9      Q    So if you look at paragraph 16,

10 subparagraph (c), you mention plaintiff initiated a

11 lawsuit based on Just Born's misleading, deceptive,

12 and unlawful conduct in the packaging of its Hot

13 Tamale candy and Mike and Ike candy in opaque

14 cardboard boxes -- cardboard containers.

15          Do you see that?

16     A    I do.

17     Q    So for purpose of your analysis you didn't

18 undertake any independent review to see if, in fact,

19 the boxes used in this -- for these products were, in

20 fact, misleading, deceptive, and unlawful, right; you

21 just assumed that that contention was correct?

22     A    I assumed that plaintiff's contention was

23 true as stated in the complaint.

24     Q    So you assumed that the product as marketed

25 was misleading, deceptive, and unlawful for purposes

1   of your analysis, correct?

2       A   I did.

3       Q   You also assumed, for example, in

4   paragraph 16(f) that in purchasing the products

5   consumers were denied the benefit of the bargain

6   between what was represented and what was received,

7   correct?

8       A   I did.

9       Q   So in coming up with your opinions you

10  assumed there was a difference in the value of what

11  was represented to consumers and what the consumers

12  received, correct?

13      A   I so assumed.

14      Q   Your opinions in this case, which are that

15  damages can be calculated on the basis of common

16  evidence for the class, does not consider the

17  contingency that the package of these products is

18  not, in fact, misleading, correct?

19      MR. MOON:  Objection.  Vague.

20      A   I don't understand it.

21  BY MR. KIZIRIAN:

22      Q   You assumed the package is misleading,

23  correct, for the Hot Tamale and Mike and Ike

24  products?

25      A   I assumed that the statement made in the

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 20 of 72

1       MR. MOON:  Objection.  Misstates his testimony.

2       A   I did not so testify.

3   BY MR. KIZIRIAN:

4       Q   You looked to see whether they would impact

5   your opinions in this case, right?

6       MR. MOON:  Same objection.

7       A   I believe I said I would consider any that

8   had changed, if any.

9   BY MR. KIZIRIAN:

10      Q   If any, all right.  And if the facts --

11  strike that.

12          Was one of your tasks in this case to

13  prepare an analysis as to how individual class

14  members' damages can be calculated?

15      A   That was not part of my scope of work.

16      Q   Your scope of work was to calculate or

17  determine if a class damage can be calculated only,

18  correct?

19      A   My scope of work was to determine whether

20  damages could be determinable on a class-wide basis

21  using common evidence.

22      Q   And by class-wide damages, am I correct in

23  saying we're talking about all products sold --

24  damages for all products sold during the class

25  period?

```
 1        A    All products named or identified in the
 2   complaint.
 3        Q    Yes.  Your opinion is as to whether some
 4   aggregate number can -- aggregate damages number can
 5   be calculated for the products sold during the class
 6   period, correct?
 7        A    That is one of my opinions, yes.
 8        Q    Your task does not include once such an
 9   aggregate number is calculated how you determine what
10   individual class members may recover from the
11   aggregate total?
12        A    That is not my current scope of work.
13        Q    You're expressing no opinion on that issue as
14   you sit here today?
15        A    Correct.
16        Q    In paragraph 16(d) you say, The Hot Tamales
17   products are uniformly packaged in opaque cardboard
18   containers with approximately 35 percent slack fill.
19             Do you see that?
20        A    I do.
21        Q    What's your understanding of the term uniform
22   as you use it in this sentence?
23        A    Substantially the same.
24        Q    With minor variation or no variation at all?
25        A    To me uniform means somewhat the same,
```

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 22 of 72

1    substantially the same, looking about the same.

2        Q    Okay.  So in paragraph (d) when you say

3    uniformly packaged in opaque cardboard containers

4    with 35 percent slack fill, is the uniformity that

5    you reference both in respect to the packaging and

6    the amount of slack fill?

7        MR. MOON:  Just for the record, I believe he said

8    approximately 35 percent slack fill.

9        MR. KIZIRIAN:  Correct.

10       A    So it's my understanding that the allegation

11   is that it is uniformly packaged and uniformly

12   approximately 35 percent slack filled.

13   BY MR. KIZIRIAN:

14       Q    So the uniformity that you're referencing

15   here applies to both facts, the packaging and the

16   estimated slack fill that is referenced, correct?

17       A    The packaging and the approximate slack fill.

18       Q    And the same is true in paragraph 16(e) when

19   you're referring to the Mike and Ike product

20   packaging and the approximately 34 percent slack

21   fill, correct?

22       A    It is.

23       Q    Is what a consumer expects in terms of fill

24   level at all relevant to your damages calculation or

25   opinions in this case?

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 23 of 72

```
 1      MR. MOON: Objection. Vague, outside the scope
 2  of his expertise.
 3      A   A consumer's expectation is outside the scope
 4  of my work.
 5  BY MR. KIZIRIAN:
 6      Q   So your model does not account for what the
 7  consumer expected in terms of fill level when they
 8  bought these boxes, is that right?
 9      A   One more time, please.
10      Q   So you're saying the consumer expectation of
11  fill level is not, and correct me if this is wrong --
12  I apologize, I don't mean to misstate your
13  testimony -- a consumer's expectation of fill level
14  is not something that is relevant to your opinions on
15  whether class-wide damages can be calculated in this
16  case?
17      MR. MOON: Objection. Vague.
18      A   I'm not sure what you mean by consumer's
19  expectations.
20  BY MR. KIZIRIAN:
21      Q   So if I bought a box of Hot Tamales with,
22  using the facts as stated in your report,
23  approximately 35 percent slack fill, okay --
24      A   Okay.
25      Q   -- and at the time I bought it I knew that
```

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 24 of 72

1    the product was filled to the level that is

2    represented here, which was 65 percent full, your

3    calculation of damages in this case would not give

4    any credence to that knowledge.

5        MR. MOON: Objection. Vague, incomplete

6    hypothetical, calls for speculation, outside the

7    scope of his expertise.

8        A    I don't know how to assess your knowledge in

9    that context.

10   BY MR. KIZIRIAN:

11       Q    You're calculating benefit of the bargain

12   damages as one form of class-wide damages in this

13   case, right?

14       A    No.   I'm saying that damages in this case

15   could be determinable on a class-wide basis using

16   common evidence using a benefit of the bargain

17   calculation in this case.

18       Q    And in coming up with that calculation, you

19   would assign some value of damage for every product

20   sold during the class period, correct?

21       A    That calculation would have various elements

22   within it.

23       Q    So if we sold, hypothetically, ten boxes of

24   candy during the class period, your model of

25   calculating damages would assign a damage value for

1    all ten boxes, correct?

2        A    The numeral ten for boxes would enter into

3    the calculation of class-wide damages.

4        Q    Your class-wide damages analysis would not

5    look to see whether, in fact, the consumers that

6    bought those ten boxes did actually sustain a damage,

7    correct?

8        MR. MOON:  Objection.  Vague.

9        A    I don't understand that question.

10   BY MR. KIZIRIAN:

11       Q    You're simply counting total sales and coming

12   up with a damage model on the basis of -- aggregate

13   damages number on the basis of the total sales,

14   correct?

15       MR. MOON:  Same objection.

16       A    I'm saying that damages in this case could be

17   determinable by including in the calculation an

18   element relating to quantities in your hypothetical

19   ten boxes.

20   BY MR. KIZIRIAN:

21       Q    So total sales.  Everything that was sold

22   during the class period, you would take those sales

23   and come up with a damage number using the model

24   based on those total sales?

25       MR. MOON:  Objection.  Vague.

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 26 of 72

1       A    Is this a hypothetical now?

2    BY MR. KIZIRIAN:

3       Q    Yeah.  I'm just trying to understand how you

4    come up with your number.

5            So using your opinion of calculating

6    class-wide damages, you would base it simply on total

7    sales during the class period, right?

8       MR. MOON:  Objection.  Vague.

9       A    I'm not following this question.

10   BY MR. KIZIRIAN:

11      Q    Your assumption is, in coming up with a

12   class-wide damages number, every product sold during

13   the class period resulted in some damage, correct?

14      A    Unless and until the court directs to the

15   contrary, I am taking into account quantity of sales.

16      Q    So you would take the quantity of sales

17   during the class period, every box sold, and come up

18   with an aggregate damages number for the class.

19   That's all you're doing.

20      MR. MOON:  I'm going to object.  Are we talking

21   about benefit of the bargain and/or the unjust

22   enrichment?

23      MR. KIZIRIAN:  Under either.

24   BY MR. KIZIRIAN:

25      Q    Both of your models assume that every box

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 27 of 72

1   sold would be part of the damage calculation,

2   correct?

3       A    Unless and until a court advises differently,

4   I am including at this time the quantity of sales.

5       Q    Right.  For every box sold during the class

6   period.

7       A    For every box sold in the applicable state in

8   the applicable time period subject to all the other

9   specifics memorialized in my declaration, Pakter

10  Exhibit 2.

11      MR. KIZIRIAN:  Can we take a short break?

12      MR. MOON:  Yes.

13              (Recess was taken.)

14  BY MR. KIZIRIAN:

15      Q    Mr. Pakter, does your opinion regarding how

16  class damages can be calculated in the case account

17  in any way or consider what fill level a consumer

18  expected in the Mike and Ike or Hot Tamale boxes at

19  the time of purchase?

20      A    My damage calculation is not dependent on the

21  consumer's expectation of fill level.

22      Q    So if they expected the box to be full all

23  the way to the top or half empty, that's not a

24  relevant consideration for your damages model,

25  correct?

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 28 of 72

1     A     That's not the way that I have contemplated
2    that the damage model could be calculated.
3         Q     So because it does not calculate on the basis
4    of what a consumer expected the fill level to be, if,
5    for example, a consumer expected the box to be full
6    to the very top and they obviously got less than
7    that, the damages would be not based on a comparison
8    between what the fill level expectation was of the
9    consumer and what they actually received, correct?
10        MR. MOON:  Objection.  Vague, incomplete
11   hypothetical.
12        A     The damage model is not dependent on an
13   individual consumer's expectation.
14   BY MR. KIZIRIAN:
15        Q     Of fill level?
16        A     Of fill level.
17        Q     So it does not account for, for example, at
18   the time of purchase, if they assumed the box was
19   half full, that's not something you consider in your
20   damages analysis, right?
21        A     The model calculates class-wide damages based
22   on the uniform or approximate slack fill percentage
23   class-wide.
24        Q     So that's the number that you consider under
25   your damages model is the slack fill number, correct?

```
1        A    One of the elements of my damages calculation
2   is the percentage of nonfunctional slack fill.
3        Q    Okay.  And the other component is what you
4   call the legal fill level, I believe, correct?
5        A    It is.
6        Q    And that legal fill level is not based on
7   what the consumer expected the fill level to be,
8   right?
9        A    No.  It is based on the lawful fill level.
10        Q    So, again, just to clarify, what the consumer
11   expected at the time of purchase in terms of fill
12   level is not one of the metrics you used in your
13   damages calculation?
14        A    An individual consumer's expectation is not
15   one of the metrics that I used.
16        Q    Okay.  Have you reviewed the testimony of
17   Daryl White?  It's not listed in there, so I assume
18   not, but just to clarify.
19        A    I have not.
20        Q    Do you know who Mr. White is?
21        A    He is the named plaintiff.
22        Q    Correct.  So I deposed Mr. White a few weeks
23   ago in Missouri, and I gave him a box of Mike and
24   Ikes, and I asked him to draw a line that at the time
25   of purchase please identify what you thought you were
```

1   getting in terms of fill level in the product, and

2   what I'm about to give you is an image of that box

3   where he drew the line on that.  So let's mark as --

4   and this is, by the way -- it's marked as Exhibit 6

5   because it's the exhibit number from Mr. White's

6   deposition, but we'll mark it next in line here,

7   which I think happens to be 6 as well, right?

8              (Pakter Exhibit 6 marked as requested.)

9   BY MR. KIZIRIAN:

10      Q    So you have Exhibit 6 in front of you, sir?

11      A    Yes.

12      Q    So what I asked Mr. White to do was take a

13  look at this box -- so this is an image of a

14  flattened box obviously to accommodate notations on

15  it, and you see there at the very top where he drew

16  the line, which is almost to the very top of the box,

17  and for your reference I said, assume the box is full

18  from the bottom up, so the line he drew is the fill

19  level that he expected at the time of purchase.  So

20  just ballparking here, it's like 99 percent plus

21  full, right?  Do you agree with me generally with

22  that?  I mean, rough approximation.

23      A    I'm following along with what you are saying.

24  I understand what you're saying.

25      Q    So Mr. White expected the box to be full

1   basically all the way to the top at the time of

2   purchase was his testimony.

3       A   Okay.

4       Q   Under your damages model, as you've

5   articulated benefit of the bargain, for example, you

6   would not credit Mr. White's expectation of fill

7   level in coming up with class-wide damages, correct?

8       A   Mr. White's expectation of fill level does

9   not fit into my calculation of what class-wide

10  damages could be calculated.

11      Q   Okay.  And neither does any class member's

12  expectation of fill level, it does not factor into

13  your class damages calculation, correct?

14      A   Correct.

15      Q   Okay.  In paragraph -- looking at Exhibit 2

16  again, paragraph 16(b), you note, On or around

17  December 28, 2016, plaintiff purchased a Hot Tamales

18  product and a Mike and Ike product for approximately

19  $1.00 each.

20          Do you see that?  Paragraph 16(b).

21      MR. MOON:  Exhibit 2?

22      MR. KIZIRIAN:  Exhibit 2.  Sorry.

23      A   Yes.

24  BY MR. KIZIRIAN:

25      Q   And that's, as we've discussed, one of the

1    facts you assumed for purpose of the opinions you

2    articulated in Exhibit 2, correct?

3       MR. MOON:  Objection.  Vague, misstates his

4    testimony.

5       A    I assumed that plaintiff's contentions are

6    true as stated in the complaint.  Not all of those

7    items impact my opinion equally or at all.

8    BY MR. KIZIRIAN:

9       Q    Do you have any facts regarding Mr. White's

10   product purchase, and in particular his purchase of

11   Hot Tamale and Mike and Ike products, other than

12   what's stated in paragraph 16(b)?

13      A    I do not.

14      Q    Do you have any information on how many times

15   he's purchased a product?

16      A    I do not.

17      Q    Do you know when he first learned about the

18   alleged deception on the basis of product packaging?

19      A    I do not.

20      Q    These were not facts that you considered in

21   formulating your opinions as stated in Exhibit 2,

22   correct?

23      A    These are not facts I would consider, no.

24      Q    Looking at paragraph 18(b), Damages Under the

25   MMPA, paragraph 18 starts by saying, To compute the

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 33 of 72

1    consumer fraud damages as set forth above, I would

2    perform the following procedures.  And you list some

3    facts I assume you would need to obtain, correct?

4        A    Correct.

5        Q    And then in paragraph (b) you say, Calculate

6    damages based on the amount of overcharge to

7    plaintiff due to the value of the nonfunctional slack

8    fill included in the products.

9        A    Yes.

10       Q    The overcharge damage resulting from the

11   purchase of a product containing nonfunctional slack

12   fill is assumed equal to the difference between the

13   value of lawfully filled products; i.e., ones that do

14   not contain nonfunctional slack fill, versus the

15   value of the products actually received.

16            Did I read that correctly?

17       A    You did.

18       Q    What is lawfully filled product as you're

19   using in this paragraph?

20       A    It is a box of product with no unlawful slack

21   fill filled in a way required by law.

22       Q    Is there a particular number as to what the

23   lawfully filled product is?  So in terms of what you

24   intend to use in this analysis, you've used

25   80 percent fill, for example.

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 34 of 72

1          Do you see that?

2     A    I do.

3     Q    Was that just an abstract number you used for

4  analysis purposes only, for example purposes only?

5     A    It is an example only.

6     Q    Okay.  So where do you intend to derive the

7  actual number for what is lawfully filled product if

8  you're actually called upon to do this analysis and

9  actually calculate the damages?

10    A    I'm assuming that that will be a fact proved

11 at trial.

12    Q    So you think it's a fact that will have to be

13 adduced in litigation to get to that number?

14    A    It is a fact that would need to be provided

15 to me in order for me to make my calculation.

16    Q    In using this lawfully filled product

17 standard, so to speak, as a number, are you aware if

18 there is such a legal standard for what is lawfully

19 filled product?

20    MR. MOON:  Objection.  Vague.

21    A    My understanding of lawful in this case is

22 not containing nonfunctional slack fill.

23 BY MR. KIZIRIAN:

24    Q    Okay.  Are you aware of some legal standard

25 that provides the number that you would plug in for

1   lawfully filled product?

2     MR. MOON: Same objection. Outside of the scope

3   of his expertise.

4   BY MR. KIZIRIAN:

5     Q  Do you know or do you not know? That's all

6   I'm asking.

7     A  I can tell you my understanding of lawfully

8   filled means not containing nonfunctional slack fill.

9     Q  That's the standard. I understand that.

10     A  Okay.

11     Q  But you're not aware of an actual number for

12   what is a lawfully filled product as you sit here

13   today?

14     A  I'm not aware of a specific number that

15   constitutes lawful filling other than filling that

16   does not contain nonfunctional slack fill.

17     Q  So your expectation is at some point that

18   number will be supplied to you as adduced in trial or

19   through other means, correct?

20     A  It is my assumption that number will be

21   provided to me somehow at some point.

22     Q  And with respect to the remainder of the

23   calculation, you would then also need to know the

24   amount of slack fill or the fill level of the actual

25   product, right? Strike that. Let me ask a better

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 36 of 72

```
 1   question. That was confusing.
 2          To do this calculation, you would need to
 3   know the value of the lawfully filled product, which
 4   we just discussed, correct?
 5      A   Yes.
 6      Q   And then the second half of the number that
 7   you would need is the fill level of the box that was
 8   actually sold to the consumer, correct?
 9      A   The average approximate fill level.
10      Q   Okay. So you would rely on an average number
11   of fill level, correct?
12      A   Yes.
13      Q   Does your model provide for a method of doing
14   this calculation if while you can come up with an
15   average there is a wide range in terms of actual fill
16   level on the product?
17          MR. MOON: Objection. Vague.
18      A   I don't understand it.
19   BY MR. KIZIRIAN:
20      Q   Okay. So you would rely on an average
21   number, correct, for a fill level?
22      A   I would rely on an average level, yes.
23      Q   And an average is basically that, it's the
24   middle number basically between a range of numbers
25   that are crunched together and then divided to find
```

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 37 of 72

1    the middle number, the average, so to speak, right?

2        MR. MOON: Objection. Vague.

3        A    An average could also be three numbers of

4    three each, the average of all three.

5    BY MR. KIZIRIAN:

6        Q    Okay. If the fill level, for example, in the

7    products ranged over a number set that's 10 percent,

8    so let's say 20 percent to 30 percent, you would get

9    an average of 25 percent, right; you would plug in

10    the 25 percent into your calculation, right?

11        MR. MOON: Objection. Lacks foundation,

12    incomplete hypothetical, vague.

13        A    Are you saying one box is 20 percent filled

14    and the other one is 30 percent filled?

15    BY MR. KIZIRIAN:

16        Q    Right.

17        A    Two boxes.

18        Q    Let's say there is two boxes, and to do your

19    calculation, you'd add those two up, divide by two,

20    and come up with the average, which would be 25, and

21    that's the number you would plug into this

22    calculation that you're proposing, correct?

23        A    So in that unique circumstance with

24    two boxes, one 20 percent filled and one 30 percent

25    filled, an average of 25 percent I believe is

1     reasonable to use.

2         Q    Okay.  But that's how your formula is set up

3     is to take the average number for those products and

4     then calculate -- compare that to the lawful filled

5     product and come up with class-wide damages, right?

6         A    That was my answer for that one specific

7     hypothetical that you posed.

8         Q    Would you do the calculation differently

9     if -- I mean, you're still going to use the average

10    number based on the formula that you've articulated

11    here, right?

12        A    I don't understand this question.

13        Q    Okay.  In the example that you give here, you

14    say if Hot Tamale products were legally required to

15    have been 80 percent filled and they were only

16    65 percent filled --

17        A    Yes.

18        Q    -- then you go on to do the calculation,

19    okay?

20        A    Yes.

21        Q    We've already discussed what the 80 percent

22    is.

23             The 65 percent number, where would that come

24    from for a class-wide damages calculation?

25        A    That would be provided to me.

1      Q   On the basis of what information? Is that an
2   average number that you're using or would you
3   calculate it separately for different ranges of slack
4   fill?

5      A   It's not something I would calculate.

6      Q   How does your formula work? What is that 65
7   number?  Where does it come from?

8      A   That percentage is -- would be provided to
9   me.

10     Q   Okay.  It would be provided to you on the
11  basis of one box or multiple boxes?  I mean, are
12  these -- I guess I'm trying to understand how you do
13  this calculation when you've got a five-year product
14  period, millions of boxes sold, and the slack fill,
15  assume that it ranges from whatever, it's not a
16  stagnant number, but it's a range, 20 to 30 percent,
17  for example.  How would you come up with a number to
18  use for the fill level?

19     A   You're assuming it ranges?

20     Q   Yes.  Assume -- I'm just trying to understand
21  how you fill that number in.  I understand how this
22  would work if the slack fill level was uniform, you
23  know, for the class period.  So you assumed for
24  purpose of your report under paragraph 16(d) and
25  16(e) that the products are uniformly packaged with

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 40 of 72

1    approximately 35 percent slack fill for Hot Tamales

2    and uniformly packaged with approximately 34 percent

3    slack fill for Mike and Ikes, right?

4        A    Yes.

5        Q    And if you took this number and plugged it

6    into your formula, which you've done with the example

7    that you have here, I can understand how you come up

8    with the 65 percent.

9        A    Okay.

10       Q    But what if -- this is for one -- you're

11   assuming that every box then has approximately

12   65 percent slack fill, right, to do this calculation?

13       A    I'm assuming an approximate slack fill

14   percentage.

15       Q    Okay.  How would you do this calculation if

16   the slack fill actually covered a range of

17   percentages?  So if it was 20 -- whatever.  Instead

18   of 35 percent, it was 25 to 40 percent.  It was a

19   range.  So some boxes are 25 percent, some boxes are

20   35 percent, some are 39 percent.

21            How would that work with your damages

22   calculations?  How would you pick the number to put

23   in there?

24       MR. MOON:  Objection.  Outside the scope of his

25   expertise, vague, calls for speculation, incomplete

1   testimony, outside the scope of his expertise, calls

2   for speculation.

3       A    I thought we had agreed that the 65 percent

4   fill level would be provided to me.

5   BY MR. KIZIRIAN:

6       Q    Right.  But the number that will be provided

7   to you is the uniform slack fill level throughout the

8   class period.  Is that your assumption?

9       MR. MOON:  Same objections and incomplete

10  hypothetical.

11      A    The number that would be provided to me would

12  be the slack fill percentage.

13  BY MR. KIZIRIAN:

14      Q    And that slack fill percentage would have to

15  be a single number, uniform number that you can plug

16  into your calculation, correct?

17      MR. MOON:  Same objection.

18      A    It would not necessarily be one number.

19  BY MR. KIZIRIAN:

20      Q    How many numbers can you get to do your

21  calculation?

22      A    So certainly it would be a number for each

23  product.

24      Q    So let me stop you for a second.  When you

25  say for each product, you're referring to one number

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 42 of 72

1    for Hot Tamales and a number for -- another number

2    for Mike and Ikes, correct?

3        A    Yes.

4        Q    So we're at at least two numbers.

5             And what about within those two sets, would

6    you be then doing the damage calculation on the basis

7    of the one number for each product?

8        A    That is how I currently contemplate doing the

9    calculation.

10       Q    Okay.  Now, when you ultimately come up with

11   the percentage, which is the 18.75 percent you use in

12   the example in paragraph 18, you are then going to

13   multiply that by the retail sales price of each

14   product sold, correct?

15       A    Depends on which part of my report you're

16   talking about.

17       Q    I'm looking at what you say in paragraph 18 I

18   guess (b) on page 14.

19       A    So 18(b) relates to the benefit of the

20   bargain calculation, yes.

21       Q    Right.

22       A    And for the benefit of the bargain

23   calculation, I would be applying that to the average

24   retail selling price excluding sales tax.

25       Q    Would you do a single calculation for all

1  products sold on the basis of the retail sales price

2  regardless of outlet for which the product was sold?

3      MR. MOON:  Objection.  Vague.

4      A   My model contemplates analyzing the average

5  retail selling price by channel of distribution and

6  presenting through a series of disclosed workings the

7  blended average retail selling price excluding sales

8  taxes if different by distribution channel.

9  BY MR. KIZIRIAN:

10     Q   What are you referring to by distribution

11  channels, retail sales versus movie sales, for

12  example?

13     A   Yes, or distributions through lot

14  distributors.

15     Q   Okay.

16     A   As based on the data presented.

17     Q   The products at issue here are sold through

18  stores, like convenience stores, markets, et cetera,

19  as well as movie theaters.

20         Are we in agreement on that?

21     A   That's my understanding.

22     Q   Are those the two channels of retail sales

23  that you're aware of?

24     A   So based on my reading of deposition

25  testimony, the channels included big-box wholesalers,

1     dollar stores, movie theaters, and other distributors
2     through to the final consumers.

3          Q    Okay.  In terms of retail pricing that you're
4     considering, do you intend to do a separate analysis
5     for products sold through movie theaters versus
6     retail stores like big-box stores, et cetera, or do
7     you intend to blend them together?

8          A    So it's data driven.  I would look at the
9     data available on average retail selling prices to
10    the consumers and take into account quantities and
11    prices so as to come up with an average retail
12    blended selling price showing my workings along the
13    way by channel of distribution.

14         Q    Do you have any information as to what the
15    pricing is for the Mike and Ike or Hot Tamales at
16    retail when sold through movie theaters?

17         A    I don't currently possess that specific
18    information.

19         Q    Do you have an indication one way or another
20    whether the pricing at movie theaters is lower, the
21    same as, or higher than retail prices at big-box
22    stores or dollar stores, et cetera?

23         A    I have no specific information on that one
24    way or the other.

25         Q    Have you analyzed to see what the range of

1   prices is -- are for Hot Tamales or Mike and Ike

2   products sold through big-box or convenience stores

3   or other retail outlets that are similar?

4       A   I have not.

5       Q   Would that range of prices be at all relevant

6   to your calculation of damages on a class-wide basis?

7       A   I contemplate taking that into account in my

8   determination of the average retail selling price.

9       Q   Is there a range in prices that would be too

10  wide in your view in terms of low end and high end

11  that would make your calculation as contemplated

12  difficult?

13      MR. MOON:  Objection.  Vague.

14      A   I cannot as I sit here today foresee such a

15  difficulty.

16  BY MR. KIZIRIAN:

17      Q   If I told you that the price at retail,

18  big-box stores, Walgreens, CVS, like stores, for Mike

19  and Ike products range from a dollar on the low end

20  to $1.79 on the high end, and I'll represent to you

21  that's actual fact, that it varies to that level,

22  would you be able to calculate class damages under

23  the benefit of the bargain formula that you've

24  articulated given that range in prices?

25      MR. MOON:  Objection.  Incomplete hypothetical,

1   vague.

2      A    And what is the time period of that range?

3   BY MR. KIZIRIAN:

4      Q    It's five years, which is the class period.

5      A    And what is the sales levels of that range?

6      Q    What do you mean by sales levels?

7      A    How many are sold at a dollar and how many

8   are sold at $1.79.

9      Q    We don't have that information.  We have the

10  range, but we don't know how many are sold at a

11  dollar and how many are sold at $1.79.

12     MR. MOON:  And I'm just going to lodge my

13  objection throughout this line of questioning.

14     MR. KIZIRIAN:  That's fine.

15  BY MR. KIZIRIAN:

16     Q    If that's the information that we had, would

17  you be able to calculate the damages on the basis of

18  the formula -- benefit of the bargain formula you've

19  articulated?

20     A    In my experience in 40 years of public

21  accounting, I can't know or remember a circumstance

22  where somebody knows that a price varies but have no

23  knowledge regarding the sales level under which those

24  prices vary.

25     Q    I appreciate that, but let's live in my world

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 47 of 72

1    for a minute.

2        A    Well, I don't think there is such a world.

3    No knowledge.

4        Q    So you're refusing to answer the question?

5        A    I did not say that.

6        MR. MOON:  Objection.  Misstates the testimony.

7    BY MR. KIZIRIAN:

8        Q    I don't have information on how many boxes

9    were sold at a dollar versus how many were sold at

10   $1.79.  I have information on that's the range of

11   market prices at retail for the product.

12            Are you saying you would need to know the

13   volume of products sold at each price to do your

14   damage calculation?

15       A    You're presenting me with a vastly incomplete

16   hypothetical that I just cannot answer sitting here

17   today first time you've posed it.  I would have to

18   think this through in additional detail and

19   understand what you mean by data or no data.

20       Q    Okay.  Let me ask you a straightforward

21   question, sir.

22       A    Okay.

23       Q    Do you need to know the volume of product

24   sold at retail at various prices in order to

25   calculate the class-wide damages?  Yes or no.

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 48 of 72

```
1        A    In the incomplete hypothetical that you've
2   posed, that might be necessary.
3        MR. KIZIRIAN:  Okay.
4        THE WITNESS:  Can we take a minute break here
5   while you're checking your notes?
6        MR. KIZIRIAN:  Sure.
7             (Recess was taken.)
8   BY MR. KIZIRIAN:
9        Q    Sir, look at page 7, Damages under the MMPA.
10  Are you with me?
11       A    Yeah, yeah, yeah.
12       Q    All right.  You say here, To compute the
13  consumer fraud damages set forth above -- and by that
14  I assume you're referring to the benefits of the
15  bargain damages?
16       A    Yes.
17       Q    -- I would perform the following procedures:
18  (a) Obtain the following information and/or
19  documentation, and you go on to list the information
20  that you would collect, correct?
21       A    Yes.
22       Q    Am I correct that you would be doing this
23  calculation for the Missouri subclass as defined in
24  the complaint?
25       A    Yes.
```

1      Q   And the calculation you're doing, again, is
2  the benefit of the bargain calculation as set forth
3  in your report, correct?

4      A   Yes.

5      Q   And in order to do this information, you list
6  the various categories of information you need.

7          Do you need every one of these data points
8  in order for your calculation to be completed?

9      A   So you could dispense with, for example,
10 quantities if you got the average retail selling
11 price without reference to those quantities.  So, for
12 example, if you had to calculate every selling price
13 using quantities and prices, then you need both.  If
14 the data presented the actual average retail selling
15 price, then you could dispense with the quantity
16 billed up to that calculation.

17     Q   Okay.  I think I understand, but just to
18 clarify.  For example, in 18(a)(iii) you say, Average
19 retail selling price of Hot Tamales and Mike and Ike
20 products to consumers at retail stores during the
21 applicable class period, right?

22     A   Yes.

23     Q   What you're telling me is, if data existed
24 that gave you the average retail selling price as
25 articulated here, you would not need what, the

1  preceding two data points?

2      A   It's possible you may not need those if (iii)

3  provides you that information without having to go

4  through (i) and (ii). It's possible that the data

5  available goes directly to (iii) without the

6  intermediate steps (i) and (ii).

7      Q   Okay. But you would still, even if you had

8  (iii), average retail selling price, you would need

9  the quantities sold in order to do your calculation,

10  right, class-wide damages calculation?

11     A   Or you would have the totality of the class

12  as ordered by the court to apply to the average

13  price.

14     Q   Right. But you would need some number on

15  quantity to multiply with the average price for the

16  class-wide damages to be calculated?

17     A   In order to get to total class-wide numbers,

18  you would need some quantity number (ii) for the

19  class as a whole.

20     Q   Why is it that you would need to know the

21  quantities of products sold to distributors as

22  opposed to quantities of products sold at retail?

23     A   It's just the pathway to the calculation.

24  This is data driven. If the data comes out by

25  customers, then you have that. It's a contemplation

1   of the data that is available in order to get to the
2   average price.
3        Q    Okay.  This is just strictly to calculate
4   average price then?
5        A    This leads -- up to (iii) and (iv) is
6   primarily data to come up with average price.
7        Q    Average retail selling price?
8        A    Average retail selling price excluding taxes.
9        Q    How would you come up with average retail
10  selling price based on sales to distributors for
11  retail stores?  How do you get to that analysis?
12       A    This is typical of data available in the
13  accounting books and records of companies.
14       Q    Right.  If I have records, for example, that
15  show how many boxes of product I sold to a particular
16  distributor, how then do you get to what the selling
17  price was at retail on the basis of that data?
18       A    I'm following the path through of quantities
19  and pricing using averaging apportionments of
20  quantities sold through the various channels to come
21  up with the blended average retail selling price.
22  These are data points along the way.
23       Q    Right.  Let's make sure we're talking about
24  the same thing as I understand it.  A distributor is
25  somebody in your view that does what, sells product

1    directly to customers, or is a distributor somebody

2    that sells to retail outlets that then sell to the

3    consumers?  What's your understanding of that term?

4        A    It could be either.  It would depend on the

5    data and the path in the way Just Born makes these

6    sales.  This is simply tracing the outbound sales

7    through the various distribution channels to get an

8    understanding of the quantities going out in the

9    various ways it's going out to the various

10   distribution channels.

11       Q    Okay.  I'm just trying to understand how

12   you're using the term.  That's all.  So when you're

13   using the term distributor, it could either be kind

14   of a middleman that sells to a big-box store or the

15   distributor can be the big-box store itself that Just

16   Born sold directly to?

17       A    Could be.

18       Q    That's all I'm trying to figure out is what

19   you mean by that.

20       A    Okay.

21       Q    You draw a distinction in paragraph 3 versus

22   paragraph 4 between average selling price to

23   customers at retail stores and average selling price

24   to customers at movie theaters.

25            Do you see that?

1     A     I do.

2     Q     Why is that distinction being made?

3     A     Because it was my understanding that the

4     pricing was different in those distribution channels.

5     Q     But you testified earlier that you don't know

6     what that difference is as you sit here today?

7     A     I do not.

8     Q     That was an assumption that you were asked to

9     make in coming up with your opinions, that there was

10    a variation in price between movie sales versus

11    retail sales, correct?

12    A     I'm presuming that the data will show a

13    difference in pricing and then I would study that

14    different pricing under those different selling

15    distribution channels.

16    Q     Why would differences in pricing, if any,

17    matter to your calculation?

18    A     Because they all roll up into an overall

19    blended average retail selling price for the class as

20    a whole showing the workings in the database.

21    Q     So you would then, if I understand you

22    correctly, still come up with a blended average

23    selling price on the basis of both retail sales and

24    movie theater sales, correct?

25    A     Yes, with appropriate weighting depending on

1   the ultimate availability of data and needs of what

2   the data will present.

3       Q   And by weighting you mean volume sold by

4   movie theaters versus volume sold at retail stores,

5   correct?

6       A   Yes.

7       Q   So you would need to know what the volume

8   sales are at each outlet in order to come up with the

9   blended average retail selling price?

10      A   If that distribution channel was material to

11  the calculation as a whole.

12      Q   So the answer is yes, if it was material to

13  the calculation, you would need volume sales from

14  movie theaters to consumers and retail sales at

15  big-box stores and the like to consumers?

16      A   If material.

17      Q   And would there be any circumstance in which

18  it would not be material?

19      A   It's always possible that when the data is

20  eventually provided that you find that one or more

21  distribution channels is just not material and does

22  not continue in a calculation due to its lack of

23  materiality.

24      Q   And it would be immaterial if the volume

25  sales was low, for example, right?

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 55 of 72

| | |
|---|---|
| 1 | A     That's one possibility. |
| 2 | Q     So if the data showed the sales for movie |
| 3 | theaters were negligible, you know, then you wouldn't |
| 4 | undertake that separate analysis to come up with the |
| 5 | blended pricing is what you're saying? |
| 6 | A     It's possible. |
| 7 | Q     But if the volume sales was significant, |
| 8 | let's say 30 percent at movie theaters and 70 percent |
| 9 | at retail, you would need to know the volume of sales |
| 10 | at movie theaters versus volume at retail to come up |
| 11 | with the average blended price? |
| 12 | A     I would need to obtain an understanding of |
| 13 | the documentation and the relative sales through the |
| 14 | various distribution channels. |
| 15 | Q     By relative sales, you mean volume of sales |
| 16 | at various distribution channels? |
| 17 | A     Yes, as contemplated by my declaration. |
| 18 | Q     And you would be doing this calculation for |
| 19 | what class? |
| 20 | A     It's my understanding that this would be made |
| 21 | for the Missouri subclass. |
| 22 | Q     So all this data that you list under |
| 23 | paragraph 18 would be derived from sales through |
| 24 | various distribution channels to Missouri class |
| 25 | members, correct? |

1    MR. MOON: Objection. Vague.

2        A    This calculation would be made to arrive at

3    an average retail selling price for the Missouri

4    subclass.

5    BY MR. KIZIRIAN:

6        Q    I understand that's the scope.  I guess what

7    I'm saying is, the data that you would need that's

8    listed in 18(a)(i), (ii), (iii), (iv), (v) would all

9    derive from Missouri sales, correct?

10        MR. MOON: Objection. Vague.

11        A    They would derive relating to those in the

12    Missouri subclass.  They would relate to data

13    applicable to the Missouri subclass.

14    BY MR. KIZIRIAN:

15        Q    Okay.  And the data applicable to the

16    Missouri subclass is Missouri distribution and sales

17    data, right?

18        MR. MOON: Same objection.

19        A    It would be data applicable related to the

20    Missouri subclass.

21    BY MR. KIZIRIAN:

22        Q    Okay.  And I believe you already testified to

23    this, but once you take this data, apply it to your

24    benefit of the bargain formula, and come up with a

25    class-wide damages total, that would be an aggregate

```
1    total for the Missouri subclass, right?

2        A    Yes.

3        Q    You presently have not -- have no opinion

4    because you've not been asked to develop an opinion

5    as to how that aggregate number would then be divided

6    to calculate damages for individual class members?

7        A    I have not been asked to opine on the damage

8    for an individual class member.

9        Q    So you have no opinion once you come up with

10   the aggregate class number under the MMPA how a

11   consumer, for example, that bought five boxes of

12   product would be compensated as opposed to a consumer

13   that bought one box of product, right?

14       A    I have no such calculation as I sit here

15   today.

16       MR. KIZIRIAN:    I'm sorry.    Can you repeat that

17   answer for me?

18               (From the record above, the reporter read

19               the following:

20               "A    I have no such calculation as I

21               sit here today.")

22   BY MR. KIZIRIAN:

23       Q    That's not part of the task that you were

24   asked to undertake as part of your retention?

25       A    I was not asked to make any calculations for
```

1    an individual class member.

2        Q    Under either the MMPA or the unjust

3    enrichment claim, right?

4        A    Correct.

5        Q    And under the MMPA you are only proposing one

6    damage model, which is the benefit of the bargain,

7    correct, as articulated in your report?

8        A    Not correct.

9        Q    Okay.  What are you proposing?

10       A    So under the MMPA I make a calculation under

11   the benefit of the bargain methodology, but I also

12   make an unjust enrichment and a manufacturing cost

13   savings damages calculation that may also apply to

14   the Missouri subclass.

15       Q    Okay.  My question, though -- listen to the

16   question -- under the MMPA claim only, which applies

17   to the Missouri subclass, you are only proposing a

18   benefit of the bargain calculation as articulated in

19   the report, just under the MMPA claim, is that right?

20       A    Yes.

21       Q    I understand that under the unjust enrichment

22   you have different methods of calculation that also

23   apply to the Missouri subclass.  That's not what I

24   was asking you.

25       A    Okay.

1      Q    Now let's move on to the unjust enrichment
2    claim.
3           What damages model are you proposing for the
4    unjust enrichment claim?
5      A    With respect to the unjust enrichment, I have
6    a -- I propose a calculation based on the damages
7    percentage and the average price received by Just
8    Born excluding sales tax as well as a manufacturing
9    cost saving, if any.
10     Q    Okay.  You, I believe, stated that for the
11   unjust enrichment claim you are using the amount of
12   money paid to Just Born from retail sales excluding
13   taxes.  I may be misstating that, so I apologize, but
14   I just want to make sure I understand.
15     A    One of the elements is the average price
16   received by Just Born for the sale of the product
17   excluding sales taxes received and transmitted to a
18   taxing body.
19     Q    You understand, though, that the sales are
20   not made by Just Born to consumers directly, right?
21     A    I understand that not all sales are made by
22   Just Born directly to consumers.
23     Q    Do you have information to suggest that Just
24   Born sells directly to consumers in any context?
25          MR. MOON:  I believe at the deposition there were

1   two retail stores that Just Born operates directly.

2   BY MR. KIZIRIAN:

3       Q   Okay.  Is that the distinction that you're

4   drawing?

5       A   I am.

6       Q   So for sales that were at the two retail

7   stores, and I believe, I'm not sure, I believe

8   they're in New York.

9       MR. MOON:  I think one was in Allentown and the

10  other was in Maryland.

11  BY MR. KIZIRIAN:

12      Q   Okay.  So with those sales where Just Born

13  has retail outlets you are suggesting that the unjust

14  enrichment take into account the retail sales price

15  paid by consumers and then backing out of that any

16  sales tax that was paid to government agencies,

17  correct?

18      A   Correct.

19      Q   And I will submit that's a small sliver of

20  the total volume at issue here.

21          Are you proposing that the remainder of the

22  sales with respect to unjust enrichment be calculated

23  using the same analysis?

24      A   I am proposing to take into account only the

25  selling price received by Just Born excluding sales

1  takes.

2       Q   How did you get the selling price received by

3  Just Born excluding sales tax for retail sales that

4  Just Born did not make?

5       A   It's the amount deposited by Just Born for

6  the sales.

7       Q   Just Born doesn't sell directly to consumers.

8  Consumers are paying -- with the exception of those

9  two retail outlets, we're talking about sales that

10 somebody walks into Walmart or Dollar Tree and pays

11 Walmart or Dollar Tree for that product purchase.

12           Are you with me so far?

13      A   Yes.

14      Q   With respect to those type of sales, what

15 amounts -- how do you come up with the amount that

16 Just Born received from those sales?

17      A   Well, at the end of the day Just Born is

18 selling its products and Just Born receives dollars

19 for selling its products and deposits those in its

20 bank account.  That's what I'm measuring.

21      Q   So you're measuring Just Born's -- the

22 amounts Just Born received from the distributors for

23 those products?

24      A   For purposes of calculating the average price

25 to -- for part of the unjust enrichment.

1       Q   Okay.  So you get an average price of what
2    Just Born received for those distribution sales,
3    correct?
4       A   I'm getting an average price of Just Born's
5    cash proceeds from selling product to whoever it
6    sells them to.
7       Q   Okay.  And with the exception of the two
8    retail stores that we discussed that Just Born sells
9    directly to consumers, that number would derive from
10   amounts Just Born charged to distributors that then
11   ultimately sell to consumers?
12      A   It's whoever Just Born invoices.
13      Q   Okay.
14      A   Whether they're consumers at the outlet
15   stores or distributors in the warehouse, it's what
16   Just Born invoices for the products.
17      Q   Okay.  But I'm excluding the retail outlet
18   stores that Just Born operates.  I want to
19   understand --
20      A   It doesn't matter.
21      Q   But -- it's what -- for purposes of the rest
22   of the sales outside of the Just Born retail outlets,
23   you are calculating average price on the basis of
24   amounts Just Born got paid to sell its products to
25   whatever the retail outlet is?

1    A    It's whatever Just Born got paid for the
2    invoices it made to whoever it sold to.
3        Q    Okay. So if Just Born sold a crate of
4    product to Walmart, okay, just so we can put names on
5    it and make this easier --
6        A    Sure.
7        Q    -- you would calculate the average price
8    based on what Just Born got paid from Walmart for
9    that crate of product?
10       A    As part of the overall calculation, yes.
11       Q    And the same would work for amounts they sold
12   to Dollar Tree or whatever other middleman that
13   distributes to such stores, whatever they got paid
14   for those sales to those entities, you would get an
15   average price on the basis of those sales?
16       A    Yes.
17       Q    It would not be on the basis of what
18   consumers paid Walmart, for example, for the box of
19   candy?
20       A    Correct.
21       Q    And then what would you do with that number
22   once you have it in terms of calculating unjust
23   enrichment?
24       A    It would be part and parcel of an overall
25   calculation of average selling prices and --

```
 1        Q    I'm sorry.  Let me stop you.  So you've got a
 2   data point.  I apologize, but I want to stop you
 3   before you get too far afield.
 4             Based on what you've discussed, you've
 5   developed an average selling price, okay.
 6        A    Yes.
 7        Q    You take that number --
 8        A    Yes.
 9        Q    -- and then do what with it to come up with
10   unjust enrichment?
11        A    You multiply that by the damages percentage,
12        Q    What is the damages percentage?
13        A    The damages percentage is the percentage
14   reflected on page 10.  It's the difference between
15   the value of lawfully filled products, ones that do
16   not contain nonfunctional slack fill, versus the
17   value of the products actually received, and the
18   example presented comes up with an 18.75 damages
19   percentage on page 10.
20        Q    Okay.  So it's essentially the same
21   calculation that you did for the MMPA in coming up
22   with the percentage, correct?
23        A    It's the same methodology for a damages
24   percentage as under the MMPA.
25        Q    So you would come up with the percentage and
```

1    multiply that with the average selling price on the
2    basis of what you just articulated, which is sales
3    price by Just Born to whoever bought the product?
4        A    Yes.
5        Q    And that sale with respect to developing
6    average price is to a distributor, to a consumer,
7    whatever the data point that is involved for purpose
8    of the sale by Just Born, correct?
9        A    It is the average selling price that we
10   previously discussed and I previously testified to.
11   That is applied to the damages percentage.
12       Q    And, again, in terms of sales that Just Born
13   made to distributors, in coming up with the average
14   price, that does not depend on amounts consumers paid
15   the retail outlet for the product?
16       A    It does not.
17       Q    It does not depend on the benefit that
18   consumers paid to the retail outlet for the product,
19   correct?
20       MR. MOON:  Objection.  Vague.
21       A    It does not depend on the dollar paid by the
22   consumer.  And that's all I can tell you at this
23   moment.
24   BY MR. KIZIRIAN:
25       Q    Fair enough.  So if I walked into a Dollar

1    Tree store, picked up -- I'm a consumer -- picked up
2    a Mike and Ike product, I bought one Mike and Ike and
3    one Hot Tamale and I gave $1.00 each to Dollar Tree,
4    in terms of calculating the unjust enrichment damage
5    under your model, you would not be counting the
6    dollar that I paid to Dollar Tree as the basis for
7    the average price, you would be calculating what
8    Dollar Tree paid to Just Born for that product,
9    right?

10       A    I would be calculating what Just Born
11   received from those products excluding sales tax.

12       Q    Right.  Not from the consumer under that
13   example I gave, but from the retail outlet that sold
14   that product?

15       A    What Just Born received.

16       Q    Right.  So if Just Born sold a box of candy
17   to Dollar Tree for 50 cents, your damage calculation
18   for purposes of determining average price would be
19   based on the 50 cents that Dollar Tree paid to Just
20   Born?

21       A    Less taxes, which would be the amount that
22   Just Born deposits in its accounting books and
23   records excluding sales tax.

24       Q    Understood.  It would not be based on what
25   the consumer paid to Dollar Tree for the product?

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 67 of 72

```
 1      A   Correct.
 2      Q   Okay.  And this would be the benefit bestowed
 3  by plaintiff upon the defendant calculation?
 4      MR. MOON:  Objection.  Vague, calls for a legal
 5  conclusion.
 6      A   This would be, as I understand it, the unjust
 7  enrichment calculation.
 8  BY MR. KIZIRIAN:
 9      Q   Okay.  Well, look at paragraph 19 in your
10  declaration, Damages for Unjust Enrichment.
11      A   Yes.
12      Q   First sentence.  For unjust enrichment, I am
13  advised by counsel that damages may come from a
14  benefit bestowed by plaintiff upon the defendant.
15          Do you see that?
16      A   I do.
17      Q   So what we've just described is one method
18  that you propose for calculating the benefit bestowed
19  by plaintiff on the defendant, is that right?
20      A   Well, it's a benefit from the plaintiff to
21  the defendant in that the defendant actually received
22  dollars.
23      Q   Okay.  But this is -- what we've been talking
24  about is your articulation of how unjust enrichment
25  damages would be calculated for a benefit bestowed by
```

1  plaintiff upon the defendant.

2      MR. MOON: I'm just going to object as vague,

3  misstates his testimony.

4      A    I regard the computation of unjust enrichment

5  as the money, the dollars traveling from consumer to

6  Just Born, but only based on the portion that Just

7  Born received. So it's Just Born's benefit from

8  selling that product.

9  BY MR. KIZIRIAN:

10     Q    The benefit received to the person that Just

11 Born sold the product to?

12     MR. MOON: Same objection.

13 BY MR. KIZIRIAN:

14     Q    You would calculate the average price for

15 your calculation on the basis of amounts Just Born

16 got paid by the person or company or distributor that

17 it sold the product to exclusive of sales tax,

18 et cetera?

19     A    My calculation would be based on the dollar

20 Just Born received, excluding sales tax.

21     Q    From whoever bought the product from Just

22 Born?

23     MR. MOON: Same objection.

24     A    From whoever Just Born sold it to.

25

1    BY MR. KIZIRIAN:

2       Q    Okay.  You also have here a statement that

3    for unjust enrichment, it is my experience the

4    damages also may come from the disgorgement of cost

5    savings to the defendant that came about by the

6    unlawful conduct.

7            Do you see that?

8       A    I do.

9       Q    What experience are you referring to there?

10      A    It's my experience that unjust enrichment may

11   also take the form of saved manufacturing expenses.

12      Q    When you say experience, you're talking from

13   an accounting perspective, correct?

14      A    From an accounting, financial analysis, and

15   business economics perspective.

16      Q    So from a financial -- I'm sorry.  What was

17   it, economics?

18      A    From a financial analysis, accounting,

19   business economics, and/or economic damages point of

20   view.  The defendant may also be enriched by a

21   savings in manufacturing costs.

22      Q    You are not expressing a legal opinion

23   through this analysis, right?

24      A    I am not.

25      Q    This is just based on your accounting-based

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 70 of 72

1  experience in using this model as a measure of
2  damages?
3      A    It's based on my understanding of generally
4  accepted peer-reviewed economic damages
5  methodologies.
6      Q    And how would you calculate the cost savings
7  to the defendant?
8      A    In the methodology described in paragraph 22,
9  beginning at page 10.
10     Q    Okay.  So paragraphs (a), (b), and (c) in
11 paragraph 22 set forth the information you would
12 need, correct?
13     A    And/or understanding I would obtain.
14     Q    Okay.  And the actual calculation is set
15 forth in paragraph 22(d)?
16     A    Yes.
17     Q    So walk me through that example that you give
18 in paragraph 22(d) on how you would calculate this
19 manufacturing discount.
20     A    I would look at the cost -- the manufacturing
21 costs that are saved by Just Born from including
22 nonfunctional slack fill, so it is a with and without
23 calculation.  In looking at the amount that it would
24 have cost to lawfully fill the package versus the
25 amount that actually filled the package and the delta

Case 2:17-cv-04025-NKL   Document 97-2   Filed 05/21/18   Page 71 of 72



